# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| BETTY L. GILBERT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:14-cv-00139-SLC |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, sued as Carolyn W. ) | |
| Colvin, Acting Commissioner, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Betty L. Gilbert appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (DE 1). For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Gilbert applied for DIB and SSI in June and July 2011, respectively, alleging disability as of October 10, 2009 (Administrative Record ("AR") 128-36); she later amended her alleged onset date to February 5, 2011 (AR 28). The Commissioner denied Gilbert's application initially and upon reconsideration. (AR 64-71, 74-79). After a timely request, a hearing was held on November 7, 2012, before Administrative Law Judge Maryann S. Bright ("the ALJ"), at which Gilbert, who was represented by counsel, and a vocational expert testified. (AR 24-59). On

---

[1] All parties have consented to the Magistrate Judge. (DE 15); *see* 28 U.S.C. § 636(c).

February 13, 2013, the ALJ rendered an unfavorable decision to Gilbert, concluding that she was not disabled because despite the limitations caused by her impairments, she could still perform her past relevant work as a secretary and a mobile home park manager. (AR 6-18). The Appeals Council denied her request for review (AR 1-5), at which point the ALJ's decision became the final decision of the Commissioner. *See Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994); 20 C.F.R. §§ 404.981, 416.1481.

Gilbert filed a complaint with this Court on May 6, 2014, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Gilbert advances just one argument—that the ALJ improperly discounted the credibility of her symptom testimony. (DE 20 at 3-6).

## II. FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Gilbert was 57 years old (AR 18, 63); had earned her GED (AR 31, 154); and had past relevant work experience as a secretary, machinist, and mobile home park manager (AR 31, 154). She alleges disability due to hypertension, chronic obstructive pulmonary disease (COPD), seizure disorder, headaches, diplopia, anxiety, and depression. (DE 20 at 2).

### B. Gilbert's Testimony at the Hearing

At the hearing, Gilbert testified that she lives with her husband, who is disabled; they have four adult children. (AR 29-30). Her bedroom is upstairs, but she may move it downstairs because she gets short of breath when climbing stairs. (AR 45). She is independent with her self care and performs basic household chores (AR 51); however, her daughter does her shopping, as

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 496-page administrative record necessary to the decision.

2

she does not think she can walk through the entire store (AR 52). She has a driver's license, but has not driven in eight months. (AR 30-31). For leisure, she reads, watches television, visits with family, plays Bingo once a week, and volunteers at her church once a month. (AR 31-32, 53-54).

When asked why she thought she could not work, Gilbert responded that she has high blood pressure and emphysema, tires easily, and her bones hurt all the time. (AR 37, 51-52). She reported being fired from several jobs for having a seizure at work. (AR 31-34). When the ALJ noted that Gilbert's doctor thought her seizures were from failing to take her blood pressure medication, Gilbert denied any current or past medication noncompliance. (AR 37-38 ("No. I've always taken my medicine. I carry it with me.")). She asserted that her hypertension and a pituitary gland problem cause her to tire easily (AR 38); her weight had increased from 110 pounds to 163 pounds in the last year (AR 29). She also suffers from insomnia. (AR 54). She claimed that she checks her blood pressure every day. (AR 47). She reported that she uses an inhaler six to 10 times a day for her breathing problems and that she has a chronic cough. (AR 45-46). She has smoked cigarettes since age 13, but quit three weeks earlier. (AR 46).

Gilbert further testified that "degenerative disc and bone disease" cause her bones to hurt in her back, hips, and knees, and that she has carpal tunnel syndrome in her right wrist. (AR 38). She was not, however, seeing a doctor for her bone pain and was simply taking over-the-counter medications. (AR 39, 42, 50, 52). She estimated that she could sit for two hours at a time (AR 49-50); she has difficulty with standing and walking due to her hip pain, as well as difficulty breathing when walking (AR 50, 52). She complained that her neck hurts all the time if she "look[s] up," and that if she does so for a period of time, she will pass out. (AR 43-44).

Finally, Gilbert complained of daily migraine headaches despite taking Topamax for the condition. (AR 39, 42). She stated that she usually takes four Excedrin Migraine pills before she gets out of bed, even though she is "not supposed to do this" (AR 42); she also takes extra Topamax during the day when she feels a headache coming on (AR 18).

*C. Summary of the Relevant Medical Evidence*

In February 2011, Gilbert presented at the emergency room with blurred vision. (AR 245). Principle diagnoses included diplopia and hypertension. (AR 247).

In August 2011, Dr. H.M. Bacchus examined Gilbert at the request of Social Security. (AR 266-68). Her blood pressure was 160/110; she was "currently not following-up or taking medication for her blood pressure," citing her lack of income. (AR 266). She reported having daily headaches and taking up to 16 to 20 Excedrin Migraine tablets per day for pain. (AR 266). She was a long-term smoker, but told Dr. Bacchus that she had now quit. (AR 266). Upon examination, she had tenderness to palpitation of the spine; her gait was slower in nature, but normal; muscle strength and tone were 4/5 throughout; grip strength on the right was 4/5 and normal on the left; fine and gross dexterity were preserved, but slower in nature; and a tinel sign was positive on the right but negative on the left. (AR 267). Dr. Bacchus's diagnoses included chronic neck pain with status post cervical surgery secondary to degenerative disc disease; low back pain; generalized arthralgias; untreated emphysema; uncontrolled hypertension with hypertensive crisis, black outs, and possible mini-stroke; migraines; history of stomach ulcers; history of right kidney contusion; history of irritable bowel syndrome; right carpal tunnel syndrome with positive tinel; and heart murmur per history, but not evident on exam. (AR 267). Dr. Bacchus opined that Gilbert needed strict medical follow up and compliance to bring her

4

blood pressure under control. (AR 267).

That same month, Dr. Joseph Gaddy, a state agency physician, reviewed Gilbert's record and opined that she could lift and carry 25 pounds frequently and 50 pounds occasionally, stand or walk about six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. (AR 281-88). His findings were later affirmed by a second state agency physician, Dr. F. Montoya. (AR 307).

About that same time, Ryan Oetting, Ph.D., a state agency psychologist, performed a mental status examination at the request of Social Security. (AR 289-90). He found that Gilbert had clinical signs of anxiety and depression, but not enough to meet the full criteria for major depression or generalized anxiety disorder. (AR 290). She had quit smoking a month earlier. (AR 289). He diagnosed her with anxiety disorder, not otherwise specified, and assigned her a Global Assessment of Functioning ("GAF") score of 67, indicating mild symptoms.[3] (AR 290).

Several days later, J. Gange, Ph.D., a state agency psychologist, reviewed Gilbert's record and found that her mental impairments were not severe. (AR 292). Dr. Gange's opinion was later affirmed by a second state agency psychologist, William Shipley, Ph.D. (AR 306).

In September 2011, Gilbert presented to the emergency room after a fall during a brief syncopal episode the day before. (AR 435-36). An x-ray of her thoracic spine was normal except for degenerative changes. (AR 345). The doctor noted Gilbert's history of hypertension,

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.* "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, Dr. Oetting used a GAF score in Gilbert's assessment, so it is relevant to the ALJ's decision. *See id.*

5

and Gilbert admitted that she does not always take her medications as prescribed. (AR 435). She symptomatically improved, and the doctor noted that signs and symptoms were consistent with a vasovagal syncope. (AR 464). The doctor documented that Gilbert had not been taking her blood pressure medicine. (AR 437).

In October 2011, the Matthew 25 Clinic sent Gilbert to the emergency room for high blood pressure. (AR 472). She continued to have elevated blood pressure despite the use of Clonidine; she also reported a history of chronic headaches for which she usually takes between 12 to 24 Excedrin tablets per day. (AR 473-74). The doctor instructed Gilbert to take Excedrin as prescribed—not as she had been taking it—and to follow up closely with Matthew 25; he did not feel that a further emergent work-up was indicated. (AR 474). Gilbert was seen at Matthew 25 in October and December for hypertension; she reported that she had stopped smoking several months earlier. (AR 421, 426).

In February 2012, Gilbert saw Dr. Paul Later, a neurologist, for her hypertension. (AR 404-05). He observed that her blood pressure was still frequently elevated despite being on multiple blood pressure medications. (AR 404). He wrote that it was unclear whether she had been consistently taking her blood pressure medications prior to her recent emergency room visits; he also questioned whether she was inconsistent in taking her thyroid medication. (AR 404-05). Dr. Later observed that Gilbert's blood pressure was poorly controlled, and that it was difficult to discern how many of her symptoms relate to hypertensive episodes versus an actual seizure disorder. (AR 406). He suggested an EEG, an MRI of the brain, and a nephrology evaluation. (AR 406). He also found that she clearly had an analgesic overdose component to her headaches, noting that she takes 12 to 16 Excedrin Migraine pills per day. (AR 406). He

6

prescribed Topamax for her headaches and cautioned her against use of caffeine, Tylenol, or aspirin. (AR 406).

In March 2012, Gilbert reported to Matthew 25 that she had two seizures in the past six months. (AR 393). An MRI of the brain showed a mildly enlarged pituitary gland. (AR 387). At an April visit, her blood pressure was 160/102, 160/110, and 148/106. (AR 314). The doctor restricted her from driving or operating any dangerous equipment. (AR 315). At another visit that month, Dr. Later increased her Topamax and encouraged her to quit smoking. (AR 382). In a May 2012 visit to Matthew 25, Gilbert's blood pressure was 160/102 and 140/90; she had quit smoking four months earlier. (AR 313). Two months later, her blood pressure was 142/78 and 140/90. (AR 311). In July, her blood pressure was 166/116 and 142/78. (AR 311).

In August 2012, Dr. Loi Phuong, a neurosurgeon, evaluated Gilbert for her chronic headaches and diplopia. (AR 373-74). An MRI showed no evidence of a pituitary adenoma, although the gland was mildly enlarged; Dr. Phuong noted that Gilbert was asymptomatic. (AR 370). An MRA (magnetic resonance arteriogram) showed a broad-based outpouching in the right supraclinoid internal carotid artery, but no definite evidence for aneurysm; there was mild left supraclinoid internal carotid artery stenosis. (AR 366). Dr. Phuong told Gilbert that these MRI findings were incidental and that no further treatment was needed. (AR 366).

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity ["SGA"] by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

8

requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. *The ALJ's Decision*

On February 13, 2013, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 9-18). The ALJ noted at step one of the five-step analysis that Gilbert had not engaged in substantial gainful activity since her amended alleged onset date of February 5, 2011. (AR 11). At step two, the ALJ found that Gilbert's hypertension and COPD were severe impairments. (AR 11). At step three, however, the ALJ concluded that Gilbert did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 14).

Before proceeding to step four, the ALJ determined that Gilbert's symptom testimony

---

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

was not entirely consistent with or supported by the medical or other evidence of record (AR 15) and assigned the following RFC:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) and can lift and carry 20 pounds occasionally and ten pounds frequently; in an eight-hour work day with regular breaks can sit for six hours and can stand and walk in combination for six hours; can occasionally climb, balance, stoop, crouch[,] kneel and crawl; should avoid concentrated exposure to pulmonary irritants such as fumes, odors, dust and gases, to poorly ventilated areas and to chemicals. In addition, the claimant should avoid concentrated use of moving machinery and concentrated exposure to unprotected heights.

(AR 14).

Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that Gilbert could perform her past relevant work as a secretary and a mobile home park manager. (AR 17). Therefore, Gilbert's claims for DIB and SSI were denied. (AR 18).

### D. *The ALJ's Credibility Determination Will Not Be Disturbed*

As stated earlier, Gilbert testified that she could not work due to high blood pressure, emphysema, and headaches; pain in her hips, knees, back, and neck; and chronic headaches. The ALJ, however, discounted Gilbert's symptom testimony, citing at least six reasons why her testimony of disabling symptoms was "not entirely consistent with or supported by the medical and other evidence of record." (AR 15). The ALJ's credibility determination, although not perfect, will be affirmed.

As this Court has often recited, an ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843

10

F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), her determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "*serious errors* in reasoning rather than merely the demeanor of the witness . . . .").

Here, the ALJ discounted Gilbert's symptom testimony for the following reasons: (1) she continued to smoke a pack of cigarettes a day until three weeks before the hearing, despite being told by her doctors to quit (AR 16); (2) she had not been taking her blood pressure medicines properly and although an EEG was compatible with epilepsy, there was no clinical correlation (AR 12, 16); (3) Dr. Later cautioned her against using too many Excedrin Migraine tablets, but she was continuing to do so (AR 16); (4) she was not consistently using her hypertension medications and taking her thyroid medications (AR 16); (5) her blood pressure was improving (AR 16); and (6) the objective medical evidence regarding her musculoskeletal pain was weak (AR 16). (*See* DE 20 at 3-4).

In her opening brief, Gilbert challenges the ALJ's reliance on two of those six reasons—her continued smoking and her noncompliance with medication. (DE 20 at 5-6). Gilbert concedes, however, that "the ALJ's other reasons [for discounting her credibility] appear to be legitimate." (DE 20 at 6). Thus, Gilbert does not dispute that, as the ALJ indicated, her blood pressure was improving once treated; there was little objective medical evidence to support the severity of her musculoskeletal complaints; and her syncope/seizure-like issues were properly considered as symptoms of her uncontrolled hypertension rather than as a separate

11

impairment, as no definitive diagnosis of epilepsy could be assigned outside a clinical correlation.

Furthermore, in her reply brief, Gilbert affirmatively abandoned her argument that the ALJ improperly considered her medication noncompliance as a factor in the credibility assessment. (DE at 1 n.1). Gilbert concedes that, contrary to her assertion in her opening brief (DE 20 at 6), the ALJ did indeed question her at the hearing about her failure to consistently take her medications (DE 30 at 1 n.1 (citing AR 37-38)); in response, she denied any noncompliance with her medications (AR 37-38). As such, the ALJ did not run afoul of Social Security Ruling ("SSR") 96-7p in discounting her credibility based, in part, on her medication noncompliance, as SSR 96-7p provides in relevant part:

> [T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the [ALJ] must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

1996 WL 374186, at *7 (July 2, 1996).

As a result, Gilbert has only one arrow remaining in her quiver—that the ALJ misused the noncompliance regulation when she discredited her based on her continued smoking. This regulation states: "In order to get benefits, you must follow treatment prescribed by our physician if this treatment can restore your ability to work." 20 C.F.R. §§ 404.1530(a), 416.930(a). "Essential to a denial of benefits pursuant to Section 404.1530 is a finding that if the claimant followed her prescribed treatment she could return to work." *Shramek v. Apfel*, 226

F.3d 809, 812 (7th Cir. 2000) (quoting *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985)). Gilbert argues that there is no evidence of record that she would be restored to a non-severe condition if she quit smoking, and that the ALJ did not find that the prescribed smoking cessation would restore her ability to work.

The Commissioner acknowledges the Seventh Circuit Court of Appeals has opined that "[g]iven the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health[,]" making it "an unreliable basis on which to rest a credibility determination." *Shramek*, 226 F.3d at 813; *see Jones v. Astrue*, No. 2:12-cv-143, 2013 WL 816170, at *13 (N.D. Ind. Mar. 4, 2013) ("[F]ailure to quit smoking after being advised to do so should generally not serve as the basis for an ALJ's credibility determination."). As such, the Commissioner, in essence, concedes that the ALJ improperly relied on Gilbert's continued smoking as a factor in her credibility determination. (DE 25 at 5-6).

The question, then, boils down to whether the ALJ's credibility determination can stand on the ALJ's remaining five reasons—none of which Gilbert challenges. In that regard, the Seventh Circuit has recognized that an ALJ's reasoning need not be perfect. *See Halsell v. Astrue*, 357 F. App'x 717, 723 (7th Cir. 2009) ("[A]lthough the ALJ's reasoning is imperfect, there is substantial evidence supporting her decision to discount [the claimant's] credibility."). "[S]o long as the flaws in the ALJ's analysis do not undermine a credibility determination that is otherwise supported by substantial evidence, the ALJ's findings should be upheld." *Jones*, 2013 WL 816170, at *13 (affirming the ALJ's credibility assessment where it, "as a whole, is supported by substantial evidence," even though the ALJ improperly considered the claimant's

13

failure to quit smoking as one factor in his assessment).

Here, on balance, the flaw in the ALJ's credibility reasoning concerning Gilbert's continued smoking is not enough to undermine her decision that Gilbert's testimony was less than fully credible. *See Similar v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) ("Though the ALJ's credibility determination was not flawless, it was far from 'patently wrong.'"). To reiterate, "[n]ot all of the ALJ's reasons must be valid as long as *enough* of them are, and here the ALJ cited other sound reasons for disbelieving [Gilbert]." *Halsell*, 357 F. App'x at 723 (citations omitted).

To review, the ALJ reasoned that the objective medical evidence did not support the severity of the limitations Gilbert described. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of [a claimant's] symptoms and the effect [of] those symptoms, such as pain, may have on [a claimant's] ability to work."). For example, the ALJ considered Gilbert's assertion of a serious pituitary gland problem, but noted that a March 2012 MRI showed only a mildly enlarged pituitary gland that required no further treatment. (AR 16 (citing AR 219, 366)). The ALJ also observed that with respect to Gilbert's hypertension, a May 2012 note indicated that Gilbert's blood pressure was improving, and an October 2011 echocardiogram revealed normal left ventricular systolic and diastolic function, normal right-sided heart pressures, and just minimal mitral and tricuspid insufficiency. (AR 16 (citing AR 313, 339)).

The ALJ further considered that musculoskeletal examination findings and imaging studies did not support Gilbert's allegations of disabling "bone" pain. (AR 16, 37). More

14

particularly, the ALJ observed that Dr. Bacchus in August 2011 noted some limitations in Gilbert's postural movements and in range of motion of her spine, knees, and hips, but that an x-ray of her lumbar spine and knees was negative. (AR 16 (citing AR 266-68, 278)). She further considered that Gilbert had full range of motion and a normal gait at an emergency room visit in September 2011, a normal musculoskeletal exam at an emergency room visit in October 2011, and an unremarkable motor examination by Dr. Later in February 2012. (AR 16 (citing AR 405, 463, 474)). "[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007).

In addition to the objective medical evidence, the ALJ considered Gilbert's use of medication, together with other treatment she had received. (AR 16); *see* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (instructing an ALJ to consider a claimant's type, dosage, effectiveness, and side effects of any medication taken to alleviate symptoms and the treatment, other than medication, the claimant has received). The ALJ noted that Gilbert continued to use of 12 to 18 Excedrin Migraine pills each day against Dr. Later's advice, and that Dr. Later concluded there was clearly an analgesic overuse component to Gilbert's headaches. (AR 16 (citing AR 405)). The ALJ also observed that Dr. Later questioned Gilbert's compliance not only with her blood pressure medication, but also with her thyroid medication. (AR 16 (citing AR 405)). In addition, the ALJ wrote that although Gilbert complained of hip pain limiting her ability to walk, she had not undergone any treatment for her hip pain. (AR 15, 38-39, 50, 52).

And as stated earlier, in accordance with SSR 96-7p, the ALJ questioned Gilbert at the hearing about her noncompliance with medication, but Gilbert affirmatively denied such

15

noncompliance. (AR 12; AR 38 ("No. I've always taken my medicine. I carry it with me.")). It is clear that the ALJ contrasted Gilbert's testimony at the hearing that she was taking, and had always taken, her prescribed medications (AR 37-38), with the evidence of record reflecting her repeated noncompliance with her blood pressure medication (*see, e.g.*, AR 267, 404, 435, 437). (*See* AR 12, 15, 16). The ALJ is entitled to consider any inconsistencies in Gilbert's statements when assessing her credibility. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) ("We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence . . . .").

Moreover, the ALJ did indeed credit Gilbert's symptom testimony in part, acknowledging that her hypertension and COPD were severe impairments. (AR 11). To accommodate her limitations arising from these conditions, the ALJ restricted her to light work with only occasional postural movements and without concentrated exposure to pulmonary irritants and hazards. (AR 14, 17); *see, e.g.*, *Vincent v. Astrue*, No. 1:07-cv-28, 2008 WL 596040, at *16 (N.D. Ind. Mar. 3, 2008) (affirming the ALJ's credibility determination where he discredited the claimant's symptoms only in part).

In sum, "an ALJ's credibility assessment will stand as long as there is some support in the record." *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (citation omitted). In this instance, although the ALJ's credibility assessment is imperfect, it is still supported by substantial evidence and will not be disturbed.

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED. The Clerk

is directed to enter a judgment in favor of the Commissioner and against Gilbert.

SO ORDERED.

Enter for this 22nd day of July, 2015.

                                                      s/ Susan Collins
                                                      Susan Collins
                                                      United States Magistrate Judge